**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 25-23373-CIV-BECERRA/TORRES

TIRE GROUP
INTERNATIONAL, LLC,

     *Plaintiff,*

v.

JIANGSU GENERAL SCIENCE
TECHNOLOGY CO., LTD, and
GENERAL RUBBER (THAILAND)
CO., LTD.,

     *Defendants.*

_____/

**REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION**
**TO DISMISS AMENDED COMPLAINT OR TO COMPEL ARBITRATION**

This case arises from a business dispute between a Florida tire distributor that has sued two Chinese tire manufacturers (a parent company and its subsidiary). Following removal of the action from state court and the filing of an amended complaint, the parent company, Defendant Jiangsu General Science Technology Co., Ltd. ("General Science"), now moves to dismiss that complaint filed by Plaintiff Tire Group International, LLC ("TGI") on jurisdictional grounds. Alternatively, it also moves to compel arbitration if jurisdiction lies.[1]

---

[1]On August 28, 2025, the Honorable Jacqueline Becerra referred this motion to the undersigned for a report and recommendation. [D.E. 15].

1

The central question is whether this Court has personal jurisdiction over General Science. After careful review of the parties' submissions—including the motion [D.E. 8], TGI's response [D.E. 10], and General Science's reply [D.E. 16]—the answer is no. The record evidence consistently points to co-defendant General Rubber (Thailand) Co., Ltd. ("General Rubber")—not its parent, General Science—as TGI's actual business counterpart over the transactions at issue in the amended complaint. For that reason, we **RECOMMEND** that General Science's motion to dismiss be **GRANTED** on jurisdictional grounds and that its motion to compel arbitration be **DENIED** as moot. The claims against General Science should be Dismissed but with leave to amend.

## I.    BACKGROUND

TGI filed this action, over tort and contract claims arising from its purchase of tires manufactured in China. Specifically, the suit was filed in the Circuit Court for the Eleventh Judicial Circuit, Miami-Dade County. [D.E. 1-2 at 16]. TGI's initial complaint, which it has since amended, included claims for breach of oral contract; unjust enrichment; quantum meruit; and breach of implied-in-fact contract levied against Defendant General Science. *Id.* at 11–16 ¶¶ 25–60. As TGI then noted in its initial complaint, "Defendant General Science is a foreign corporation [focusing on research and development, production, and sales of premium tires] with its principal place of business located in China." *Id.* at 8 ¶¶ 3, 13.

A dispute related to proper service of process ensued. [D.E. 29 at 2–3] (Order denying remand and detailing service of process efforts for General Science). TGI

then filed an amended complaint in state court, on May 30, 2025, that joined co-Defendant/subsidiary General Rubber as a second defendant in the case. [D.E. 1-2 at 142]. General Rubber is alleged to be "a wholly owned subsidiary of General Science[,] focused on the production and manufacture of premium tires." *Id.* at 144 ¶ 15. The amended complaint greatly expanded the original claims: breach of oral contract; breach of contract; unjust enrichment; quantum meruit; breach of implied-in-fact contract; defamation – libel; defamation – slander; negligence (against General Rubber); negligence (against General Science); tortious interference; violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"); injunctive relief; and conversion. *Id.* at 147–160 ¶¶ 36–133.

TGI then tried to service process on General Rubber with much difficulty. [D.E. 30-32]. Just recently, on January 16, 2026, TGI filed its notice of filing acceptance of substitute service, notifying the parties and the Court that the Florida Secretary of State had accepted substitute service. [D.E. 30].

In the meantime, however, General Science removed the action to federal court. [D.E. 1]. TGI moved to remand the case, but that motion was Denied so this federal action proceeds. [D.E. 29]. But General Rubber has yet to enter a filing or other manner of appearance in this case. The parent General Science, on the other hand, has participated after it was purportedly served, first by filing the removal and now by moving to dismiss the amended complaint. [D.E. 8]. General Science's motion argues that the Court lacks personal jurisdiction, both on long arm/due process arguments as well as improper service. It also argues, alternatively, that TGI's

3

claims are subject to arbitration based on the contract documents it entered into with the subsidiary entity.

## II.    ANALYSIS

Defendant General Science has moved under Federal Rule of Civil Procedure ("FRCP") 12, subsections (b)(2) and (5), to dismiss Plaintiff TGI's complaint—lack of personal jurisdiction and insufficient service of process, respectively.  Fed. R. Civ. P. 12(b)(2), (5).  Because it bears heavily on this Court's ability to hear this case as pleaded, we begin with whether we have personal jurisdiction over Defendant General Science.

That determination is based on a multi-staged process involving principles of both state law and constitutional law.  It begins with the settled understanding that, in ruling on a motion to dismiss, the Court takes the allegations in the complaint as true and construes the allegations "in the light most favorable to the plaintiff." *Rivell v. Private Heath Care Sys., Inc.*, 520 F.3d 1308, 1309 (11th Cir. 2008) (citing *Hoffman-Pugh v. Ramsey*, 312 F.3d 1222, 1225 (11th Cir. 2002)); *see also Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1350 (11th Cir. 2013) (extending to motions to dismiss for want of personal jurisdiction under Rule 12(b)(2)).  "When considering a motion to dismiss, all facts . . . 'are to be accepted as true and the court limits its consideration to the pleadings and exhibits attached thereto.'"  *Grossman v. Nationsbank, N.A.*, 225 F.3d 1228, 1231 (11th Cir. 2000) (quoting *GSW, Inc. v. Long City*, 999 F.2d 1508, 1510 (11th Cir. 1993)).

To plead a basis for personal jurisdiction over a non-resident defendant, however, conclusory allegations are not accepted as true. To establish personal jurisdiction over a nonresident defendant, a plaintiff "bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction." *Louis Vuitton,* 736 F.3d at 1350 (quotation omitted). "Vague and conclusory allegations do not satisfy this burden." *Catalyst Pharm., Inc. v. Fullerton*, 748 F. App'x 944, 946 (11th Cir. 2018) (citing *Snow v. DirecTV, Inc.,* 450 F.3d 1314, 1318 (11th Cir. 2006)). Sufficient facts must be pleaded that, if true, would sustain the threshold showing necessary to "withstand a motion for directed verdict." *Id.* (citing *Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino,* 447 F.3d 1357, 1360 (11th Cir. 2006)).

When a defendant submits affidavit evidence challenging jurisdiction, the burden shifts to the plaintiff to produce supporting evidence, unless the defendant's affidavits contain only conclusory denials. *Stubbs,* 447 F.3d at 1360; *Madara v. Hall*, 916 F.2d 1510, 1514 (11th Cir. 1990). The Court then accepts the complaint's facts only "to the extent they are uncontroverted by the defendant's affidavits." *Kernel Records Oy v. Mosley*, No. 09-21597-CIV, 2010 WL 2812565, at *4 (S.D. Fla. July 5, 2010).

A prima facie basis for personal jurisdiction has two elements. "(1) whether personal jurisdiction exists over the nonresident defendant[] under Florida's long-arm statute, and (2) if so, whether that exercise of jurisdiction would violate the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution." *Louis*

*Vuitton,* 736 F.3d at 1350 (citing *Mut. Serv. Ins. Co. v. Frit Indus., Inc.*, 358 F.3d 1312, 1319 (11th Cir. 2004)).

In this record, both parties have indeed submitted affidavits and supporting evidence. [D.E. 8-1, 10-2, 16-2]. So we must consider that supporting record together with the prima facie allegations of the amended complaint to see if a proper basis for long-arm jurisdiction exists over General Science.

### A.    *Whether Florida's Long-Arm Statute Reaches General Science*

TGI invokes three subsections of Florida's long-arm statute to sustain its initial jurisdictional burden. It alleges, generally, that both Defendants (1) "operate, conduct, engage in, or carry on a business or business venture in [Florida]"; (2) "caused injury to persons or property within this state arising out of an act or omission by [them] outside this state while [they] were engaged in solicitation or service activities within this state or [their] products, materials, or things processed, serviced or manufactured by [them] anywhere were used or consumed within [Florida] in the ordinary course of commerce trade or use"; and (3) "breached a contract in [Florida] by failing to perform acts required by the contract to be performed in [Florida]." [D.E. 1-2 at 143 ¶¶ 5–7].

These jurisdictional allegations correspond to subsections (1)(a)(1), (6), and (7) of the Florida long-arm statute:

> (1)(a) A person, whether or not a citizen or resident of this state, who personally or through an agent does any of the acts enumerated in this subsection thereby submits himself or herself and, if he or she is a natural person, his or her personal representative to the jurisdiction of the courts of this state for any cause of action arising from any of the following acts:

6

1. Operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state.
. . .
6. Causing injury to persons or property within this state arising out of an act or omission by the defendant outside this state, if, at or about the time of the injury, either:

a. The defendant was engaged in solicitation or service activities within this state; or

b. Products, materials, or things processed, serviced, or manufactured by the defendant anywhere were used or consumed within this state in the ordinary course of commerce, trade, or use.

7. Breaching a contract in this state by failing to perform acts as required by the contract to be performed in this state.

Fla. Stat. § 48.193(1)(a)(1), (6)–(7).

In measuring the amended complaint with the requirements of these provisions, Florida's long-arm statute "is strictly construed, and the person invoking jurisdiction under it has the burden of proving facts which clearly justify [its use]." *Oriental Imports & Exports, Inc. v. Maduro & Curiel's Bank, N.V.*, 701 F.2d 889, 891 (11th Cir. 1983) (citing *Bank of Wessington v. Winters Gov't Sec. Corp.*, 361 So. 2d 757, 759 (Fla. 4th DCA 1978) (noting that, "[w]e are fully cognizant that Florida's long arm statute is of the type that requires more activities or contacts to sustain service of process than are currently required by decisions of the Supreme Court of the United States"). In other words, although TGI generally alleges that Defendants, plural, are subject to Florida's long-arm statute, TGI bears the burden of proving facts that justify its reach to confer jurisdiction over *both* Defendant General Rubber *and* Defendant General Science*, individually*.

Before turning to each subsection, it is important to understand the basic factual picture that the record presents as that bears heavily on all three prongs of

7

the statute. In the roughly two-and-one-half pages in TGI's amended complaint recounting its factual allegations, General Rubber appears only three times. Its parent General Science appears nearly twenty-five times. [D.E. 1-2 at 144–146 ¶¶ 13–35]. General Rubber is, essentially, relegated to little more than a "wholly owned subsidiary" producer of tires and shipment fulfiller for General Science. *Id.* at 144 ¶¶ 15–16. So on the surface of the amended complaint General Science is ostensibly the right party to answer these claims.

Yet the supporting documents in the record on the motion, presented by both parties, tell a very different story. Every invoice for the three tire shipments that appear to be central to the dispute identifies General Rubber, not General Science, as the contractual counterpart of TGI. [D.E. 8-2]. Every material email exchange regarding marketing and purchases that purport to sustain the claims in the amended complaint were with General Rubber representatives, not General Science. Indeed General Science is nowhere to be found in the documentary record that gives rise to these claims, at least based on what the parties have submitted in support or opposition to this motion.

In particular, even focusing on the record submitted by TGI itself, it is hard to square the allegations in the amended complaint with the version of events set forth supporting materials submitted by its President, Joaquin Gonzalez, Jr. Specifically the amended complaint leads with allegations of the existence of an exclusivity agreement between General Science and TGI, causing TGI to be the exclusive supplier of Lancaster tires in Florida and Puerto Rico. [D.E. 1-2 at 144 ¶ 16]. Fair

8

enough.  But then allegations jump to three invoiced purchases of tire shipments in 2022 and 2023.  It is *these* purchases the amended complaint cites as the link for General Science to be "under the obligations of the[] *purchase agreements*." *Id.* ¶¶ 17, 19 (emphasis added).

TGI then alleges that the parties fell out of favor with each other: General Science "surprisingly and unilaterally[] recalled" the container shipments of said tires (sent by subsidiary General Rubber) while en route to TGI.  *Id.* ¶ 19.  Then, later, "General Science inexplicably filed a claim with their trade credit insurer[, Sinosure,] after claiming that TGI did not pay for the shipments." *Id.* at 145 ¶ 22.  This action purportedly damaged TGI's reputation such that it "is no longer able to do business with Eastern or Southern Asia." *Id.* ¶ 24.

Only later—after detailing the happenings of the July 2023 shipping container cancellations—does the amended complaint raise (1) the presence of "a separate [marketing] agreement," with no listed timeframe but generally tied to Lancaster tires; and (2) that "in or around 2022, General Science inexplicably" stopped supplying Lancaster tires and only agreed to provide TBB branded tires. *Id.* at 145–46 ¶¶ 27–28.  These events are largely unmoored from the remainder of the allegations and are slotted in at least somewhat out of chronological order.

When one turns to Mr. Gonzalez's declaration, however, the focus of the underlying dispute centers on the breakdown of the alleged exclusivity and marketing agreements (ostensibly now from a similar time period). This breakdown was caused by General Science refusing to supply Lancaster tires and instead only

9

supplying TBB tires. That then caused TGI to lose its investment in its marketing of the Lancaster tires thereby giving rise to General Science's supposed liability as to, at least, the marketing of the Lancaster tires. [D.E. 10-2 at 2 ¶¶ 7–13]. The three invoices at the heart of the complaint, then, are dated between 2022 and 2023, and they occurred *after* the switch from Lancaster to TBB tires. *Id.* at 3 ¶ 20. This is consistent with the printouts of the invoices, which reflect only TBB branded tires. [D.E. 8-2 at 3, 7, 10, 16, 23].

So why does this matter? The available record evidence shows that while TGI was attempting to be reimbursed by General Science for the money it had spent on marketing the Lancaster tires, *it apparently proceeded to purchase TBB branded tires anyway,* perhaps hoping to still sell those tires. And, as the allegations go, so ensued General Science "unilaterally" halting the TBB tire shipments (shipped by way of General Rubber) and "inexplicably" filing a claim with Sinosure after "claiming that Tire Group did not pay for" any of the three tire shipments from the listed invoices. [D.E. 10-2 at 4 ¶¶ 22–24] This, per TGI, is what then caused them reputational harm to the end that it can no longer do business in Eastern or Southern Asia. *Id.* at 5 ¶¶ 29–30.

As this is a jurisdictional inquiry over disputed facts, we cannot rely just on the face of the amended complaint and must turn to the supporting affidavits and record submissions. In doing so we must take Mr. Gonzalez's declaration at face value and as correctly setting forth the relevant course of events. But that is true only "to

the extent they are uncontroverted by the defendant's affidavits." *Kernel Records Oy*, 2010 WL 2812565, at *4. And several of these allegations are indeed controverted.

Proceeding chronologically, TGI first alleges that "[i]n or around 2021, Tire Group and General Science entered into a deal whereby General Science would exclusively supply Tire Group with Lancaster branded tires for sale in Puerto Rico and Florida." [D.E. 10-2 at 2 ¶ 7]; *see also* [D.E. 1-2 at 144 ¶ 16] (identical language in amended complaint). General Science's affidavit from its Head of the Legal and Audit Department, Ms. Xu Wenxia, however, states the following:

> General Science also does not have any distributors or customers located in Florida and General Science has never directly sold or shipped tires into Florida. To be clear, between 2011 and 2019, General Science sold tires to the U.S. market through one single U.S. distributor registered in the State of California. In 2019, however, due to tariff-related developments between China and the United States, General Science ceased selling tires to the U.S. market entirely.

[D.E. 8-1 at 3–4 ¶ 8].

Based on our review of the record, no party has provided a document evidencing either the exclusivity agreement or the marketing agreement. There appears to be some suggestion in Mr. Gonzalez's declaration that the marketing agreement was purely oral, having been "negotiated on a call with Menjiao Feng" of General Science. [D.E. 10-2 at 2 ¶ 11]. And indeed Ms. Wenxia's supplemental declaration, submitted with General Science's reply, acknowledges that, "Mr. Feng did attend a meeting that occurred between General Rubber and Plaintiff, as he will sometimes attend meetings involving General Science's subsidiaries." [D.E. 16-2 at 5 ¶ 14].

Subsequent statements from Mr. Gonzalez, however, detail how the marketing agreement was, or was intended to be, carried out:

> To effectuate said marketing agreement, Tire Group began a marketing campaign in Florida that included wrapping their trucks with advertisement for General Science and the Lancaster tire, and making and selling hats, banners, plastic bottles, lunch boxes, book bags, video advertisements, jackets, keychains, polo t-shirts, pens, and clips branded with General Science and Lancaster tire advertising.

[D.E. 10-2 at 2 ¶ 12]. And TGI, by way of its President's declaration, is very specific—it was advertising *for General Science. Id.* But TGI's own invoice records, included in Exhibit 2 of General Science's reply, does not support these claims and, in fact, shows otherwise.

For example, an invoice stamped with TGI branding at [D.E. 16-2 at 13] lists 2 wrapped trucks, "REF: Lancaster Credit Note needed (2 trucks to wrap[)]," on an invoice for $5,200.00, and also notes that it is being sold to "General Rubber (Thailand)." This is consistent with an email from Anna Chen, Tires Division Manager (USA) for General Rubber, at [D.E. 16-2 at 14–15], which reflects General Rubber agreeing to make a $5,200 deduction as a credit towards shipment GRTG-P-20210502-7. So General Science is nowhere to be found on the invoice or in the emails regarding the wrapped trucks. That squarely supports General Science's own record evidence that seeks to show that General Science had nothing to do with these events. *See, e.g.*, [D.E. 8-1 at 3–4 ¶¶ 8 (no sales in the United States after 2019), 12 (no involvement with TGI for marketing endeavors)].

TGI could have pointed us to other pieces of record evidence that shows that it created items to advertise for "General Science and Lancaster," such as pictures of

the trucks, polo shirts, keychains, pens, etc.  For that matter, TGI could have provided the exclusivity and/or marketing agreements themselves—or, if they were oral, communications or reflections of actions evidencing that they proceeded as-pleaded. But it has not.  And the evidence in this record, while it does reflect marketing activity for Lancaster tires, ties TGI to *General Rubber*—not General Science.

This conclusion is further consistent with the 2022 and 2023 invoices for the shipments of TBB branded tires.  For example, the amended complaint lists as the first invoice, "GRTG-P-202217/ Container #TCNU6339430."  By comparison, [D.E. 8-2 at 2–8] contains numerous documents relating to this shipment—each of which is stamped with the invoice number "GRTG-P-202217."  *Not one of the documents associated with this invoice number mentions General Science,* but they do all list in some fashion *General Rubber* as the seller.

The proforma invoice at [D.E. 8-2 at 3] even notes that the beneficiary of the sale is "General Rubber (Thailand) Co., Ltd." and lists General Rubber's associated bank information.  This is further consistent with the documentation for the other two invoices.  [D.E. 8-2 at 10 (proforma invoice printout for "GRTG-P-202303" listing "General Rubber (Thailand) Co., Ltd." as the beneficiary of the transaction and including associated bank information), 23 (commercial invoice printout for "GRTG-P-202304" listing "General Rubber (Thailand) Co., Ltd. as the beneficiary and including associated bank information)].

TGI certainly could see how this all would look.  A footnote in Mr. Gonzalez's declaration attempts to tie the flow of invoices to General Science:

> When making purchases such as these, the general procedure was for Tire Group to send a purchase order to General Science describing what it wanted to order, General Science or General Rubber would send a "pro forma invoice" with an *estimate* of the costs for the shipment, and then General Science or General Rubber would produce a *final* invoice with the final price and final terms of the purchase.

[D.E. 10-2 at 3 ¶ 20 n.1] (emphasis in original).  But, again, there are no invoices in the record that name General Science as a shipper, seller, or beneficiary of a sale. There are, however, several invoices and other documents for each of the three 2022 and 2023 TBB branded tire sale shipments listed in the amended complaint, *and they all list General Rubber*.  This is significant for our purposes because General Science's supplemental declaration reiterates, as to TGI's allegations regarding invoicing procedure, it "has not sold tires to Plaintiff.  General Science only sold tires through one California distributor from 2011 and 2019, and since 2019 has ceased all sales to the United States."  [D.E. 16-2 at 6 ¶ 15].

In sum, this record evidence undermines much of the thrust of the jurisdictional allegations that TGI is relying on to sustain General Science as a proper party in this Florida action.  Moreover, in support of TGI's response and Mr. Gonzalez's declaration, TGI included as Exhibit A an email from law firm Mazzola Lindstrom LLP to Mr. Gonzalez, stating, among other things:

> Mazzola Lindstrom LLP has been retained by Jiangsu General Science Technology Co., LTD. and their trade credit insurer China Export & Credit Insurance Corporation ("Sinosure") in an effort to secure a debt obligation owed to them by Tire Group International LLC.
>
> It appears from documents supplied to us, including sales contracts and bills of lading, that Tire Group International LLC has defaulted on payments due to Jiangsu General Science Technology Co., LTD. for goods delivered and, as a result, Tire Group International LLC has an

14

> unpaid obligation to Jiangsu General Science Technology Co., LTD.
> currently totaling $101,117.36 (without interest).

[D.E. 10-2 at 7]. This letter, TGI claims, is evidence of General Science "inexplicably fil[ing] a claim with their trade credit insurer," Sinosure, after "unilaterally recall[ing]" all three TBB branded tire shipments—the shipments detailed by the invoices discussed above. *Id.* at 4 ¶¶ 22, 24.

Yet, a close look at General Science's supplemental declaration refutes this claim:

> General Science had no prior knowledge of the Demand Letter prior to it being provided as an attachment to the Response. General Science has not retained the law firm of Mazzola Lindstrom LLP for the purposes of collecting a debt owed to it by Plaintiff, or in any other capacity, and by extension, did not instruct the law firm of Mazzola Lindstrom LLP to send the demand letter.

> As explained in my prior Declaration dated August 4, 2025, General Science is indeed the policyholder under a Comprehensive Short-Term Export Credit Insurance Policy issued [by] Sinosure (the "Policy") for all insurable goods transactions. The Policy covers General Science, as well as its overseas subsidiaries—including its Thai subsidiary General Rubber (Thailand) Co. Ltd.[] Indeed, General Rubber filed the claim referenced by TGI under the Policy[.]

[D.E. 16-2 at 3 ¶¶ 6–7].

In fact, General Science then went further to provide as Exhibit C to their reply a declaration from Lucas Calderon, the paralegal at Mazzola Lindstrom LLP who signed the at-issue demand letter:

> In the Demand Letter, reference is made to the fact that Mazzola Lindstrom LLP "has been retained by Jiangsu General Science Technology Co., LTD. and their trade credit insurer China Export & Credit Insurance Corporation ('Sinosure') in an effort to secure a debt obligation owed to them by Tire Group International LLC." I understand that, based on this language in the Demand Letter, Tire

> Group has indicated that the Demand Letter was sent on behalf of Jiangsu General Science Technology Co., LTD.[]  I offer this Declaration to clarify.
>
> Mazzola Lindstrom LLP does not represent General Science, has not been retained by General Science to collect on the debt obligation identified in the Demand Letter, did not communicate with General Science before sending the Demand Letter, and General Science did not otherwise authorize Mazzola Lindstrom LLP to send the Demand Letter.  Rather, Mazzola Lindstrom[] was retained by Sinosure to collect the "debt obligation" referenced in the Demand Letter, and the Demand Letter was sent on behalf of Sinosure and Sinosure only.  All references to General Science in the Demand Letter [are] due to the fact that General Science is the named insured under the insurance policy issued by Sinosure under which Sinosure pursued the debt.

[D.E. 16-2 at 2 ¶¶ 4–5].

So, although the representation in the at-issue demand letter was arguably misleading as written, General Science has produced sworn testimony from the third-party who sent the letter stating that General Science was not siccing Sinosure on TGI.  This is all to say that, for the purposes of § 48.193(1)(a)(1), (6)–(7) of Florida's long-arm statute, we cannot agree based on this record evidence that a prima facie case can be made that General Science acted in a way that would cause them to be hauled into court in Florida.  Even focusing alone on TGI's record evidence, the record only ties TGI's relevant dealings that gave rise to these claims to General Rubber.  This distinction matters.  General Rubber's subsidiary status does not, by itself, make General Science responsible for General Rubber's activities without a slew of additional factual allegations.  *See Sun Trust Bank v. Sun Int'l Hotels, Ltd.*, 184 F. Supp. 2d 1246, 1268–269 (S.D. Fla. 2001) (listing the required elements to "pierce the corporate veil" to impute actions from a subsidiary to a parent).

16

Now that we fully understand this context from the record presented, we will address each subsection in turn beginning with section (1)(a)(1).

### 1. *Section (1)(a)(1)—Carrying on a Business in Florida*

To show that a defendant was carrying on a business or business venture in the state, either itself or through an agent, '[t]he activities of the [defendant] sought to be served … must be considered collectively and show a general course of business activity in the State for pecuniary benefit.'" *Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 627 (11th Cir. 1996) (citing *Dinsmore v. Martin Blumenthal Assocs., Inc.*, 314 So. 2d 561, 564 (Fla. 1975)).  On this record TGI has not made that showing.

First, General Science avers that it does not now conduct and has not conducted any manner of business in the United States since 2019 [D.E. 16-2 at 6 ¶ 15]—at least two years before the alleged exclusivity agreement between General Science and TGI.  Further, General Science has represented that they do not maintain an office in the United States; have no employees officers, agents, or sales representatives in the United States; and does not directly sell products to or solicit the business of consumers in the United States.  [D.E. 8-1 at 3 ¶¶ 5–7].

So General Science has submitted evidence that it ceased all tire sales to the United States (or Florida in particular) in 2019, two years before the alleged agreements with TGI that gave rise to these claims.  And TGI does not refute that General Science has no physical presence in the United States.  Based on this record, the Court cannot find that a prima facie basis exists to find that General Science was carrying on a business venture in the state during the relevant time period.

17

Second, as to TGI's allegations that General Science was the entity with which it contracted in 2021, even putting aside General Science's declaration statements, there is no evidence in the record—no invoice or email—that suggests TGI indeed had any sort of contract with General Science.  Every piece of documentary evidence that is relevant to TGI's claims reflects a relationship with General Rubber instead.  Several invoices and emails identify an ongoing relationship between TGI and *General Rubber* that tracks the course of events that TGI attributes, instead, to General Science.

TGI's burden under this subsection is real and tangible. "If the defendant sufficiently challenges the plaintiff's assertions, the plaintiff must affirmatively support its jurisdictional contention with record evidence, and may not merely rely on the factual allegations set forth in the complaint." *Sun Trust Bank*, 184 F. Supp. 2d at 1267.  TGI has not done so.  While true that, "[w]here the parties' evidence conflicts, the Court must construe all reasonable inferences in favor of the plaintiff," *id.*, there are few such inferences to be drawn when the evidence TGI has put forth is readily contradicted by, at least, emails and invoices that so clearly evidence a relationship between TGI and *General Rubber*.

Third, that General Rubber is a wholly owned subsidiary of its parent, General Science, does not inherently mean that General Science is responsible for each and every activity of General Rubber.  There is, in fact, an entire subspeciality of commercial litigation dedicated to questions of corporate structure, like whether the activities of General Rubber *could be* imputed to its parent, General Science.  *See,*

18

*e.g.*, *Sun Trust Bank*, 184 F. Supp. 2d at 1268–269 ("In order to 'pierce the corporate veil' and impute the Florida subsidiaries' activities directly to the defendants, plaintiffs would have to allege a) that the subsidiaries are mere instrumentalities of the parent, and b) that the defendants engaged in 'improper conduct' in the formation or use of the corporations.") (citing *MeterLogic, Inc. v. Copier Solutions, Inc.*, 126 F. Supp. 2d 1346, 1357 (S.D. Fla. 2000)).

But TGI does not even begin to ask these questions. It instead simply says, in so many allegations, "General Science did it." The problem with that approach is that, at least on this record, not a single invoice or email appears to suggest this is the case. And the only record evidence beyond Mr. Gonzalez's declaration that TGI points to is a demand letter from Mazzola Lindstrom LLP regarding the Sinosure claim, about which the paralegal at the firm whose signature is on the letter declared under penalty of perjury that General Science had neither control over nor knowledge of the sending of the letter. Faced with this record we cannot reach the legal conclusions TGI asks of us in order to find jurisdiction under subsection (1)(a)(1).

The Eleventh's Circuit oft-cited decision in *Sculptchair, Inc. v. Century Arts, Ltd.* is instructive. There the court affirmed the dismissal of a Canadian company for lack of long-arm jurisdiction under this subsection even though one of its contractors made only sporadic sales presentations in the state. 94 F.3d 623 (11th Cir. 1996). Here by contrast, General Science's situation is even more removed; TGI has not shown that General Science, as opposed to General Rubber, ever engaged in any Florida-directed activity at all during the relevant time period.

19

Specifically, *Sculptchair* involved certain individual defendants—residents of Canada—that originally entered into a licensing agreement with Florida corporation, Sculptchair, to manufacture certain chair covers in Canada. *Id.* at 625–26. Per that agreement, the parties had several meetings in Florida to jump start the venture, including a trip to sign the agreement; a "four day logistical meeting" regarding the production of the chair covers; and a meeting to discuss issues regarding maintenance and performance for the design of the chair covers. *Id.* at 626. Notwithstanding efforts to address these issues, difficulties in production persisted and the venture ultimately failed. *Id.*

Two of the individuals originally involved in the venture formed a new company, Chair Decor, Inc., which allegedly sold similar chair covers to those produced under the Sculptchair license. *Id.* Sculptchair sued Chair Decor for, among other things, patent and trademark infringement. *Id.* The complaint also named the two Canadian individuals running Chair Decor, as well as members of their family alleged to have been involved, and "an entity designated as 'Chair Decor of Sunrise, Florida.'" *Id.*

On appeal of the dismissal of Sculptchair's complaint for want of personal jurisdiction, the Eleventh Circuit affirmed as to all but one of the defendants. The Court agreed that Chair Decor "was not carrying on a business or business venture in Florida" because it "never existed," despite two of Sculptchair's employees testifying that they attended a product presentation meeting in Florida for Chair Decor products. *Id.* at 628. The court affirmed as to Chair Decor of Canada, as well,

20

because "there is no evidence that Chair Decor of Canada (as opposed to its independent contractor) ever directly manufactured, sold, leased, or solicited orders for chair covers or any other products in Florida. " because Mr. Rich was "acting as an independent contractor as opposed to an agent." *Id.* at 629.[2]

Similarly General Science was, at all times, a non-resident of the State of Florida [D.E. 16-2 at 3 ¶¶ 6–7] and not transacting business in the State of Florida. TGI's allegations that General Science was their contracting partner and the entity that caused them, by way of an insurance claim, such reputational harm, simply do not hold up in the face of the record of evidence before the Court. In other words, TGI has not carried its burden under § 48.193(1)(a)(1) to establish a prima facie case as to this Court's jurisdiction over General Science; it has not shown "a general course of business activity in the State for pecuniary benefit." *Sculptchair*, 94 F.3d at 627. What is clear is that TGI had a business relationship, including shipping and marketing activities, with General Rubber. [D.E. 8-2 at 2–8 (invoice documents for shipment GRTG-P-202217 noting that the sale of TBB branded tires is between General Rubber and TGI, and the benefit of the sale accrues to General Rubber)]. That does not help its case against General Science.

---

[2]     The lone defendant who was not dismissed, daughter of one of Chair Decor's directors who while in Florida "admittedly operated as an independent contractor and sporadic sales representative for Chair Decor" including "travel[ing] to four or five Florida businesses and [giving] them product presentations" and "circulat[ing] a price list to ten or so individuals describing Chair Decor of Canada's product line" before forwarding any orders to the Chair Decor of Canada staff. *Id.* at 626–28. Although her sales efforts were "sporadic at best," "her marketing efforts, viewed collectively, qualified as a general course of business activity in Florida for pecuniary benefit." *Id.* at 628.

21

In short, we find that Florida's long-arm statute does not extend to General Science under Florida Statute § 48.193(1)(a)(1): "Operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state."

## 2. *Section (1)(a)(6)—Causing Injury to Persons or Property in Florida*

Section 48.193(1)(a)(6) of the Florida long-arm statute contemplates the following:

> Causing injury to persons or property within this state arising out of an act or omission by the defendant outside this state, if, at or about the time of the injury, either:
> a. The defendant was engaged in solicitation or service activities within this state; or
> b. Products, materials, or things processed, serviced, or manufactured by the defendant anywhere were used or consumed within this state in the ordinary course of commerce, trade, or use.

Fla. Stat. § 48.193(1)(a)(6).

This subsection does not apply for three independent reasons. First, and again incorporating the analysis of the record detailed above, TGI has not shown that General Science was "engaged in solicitation or service activities" within the State of Florida. To the contrary the available record shows that any business relationship that existed (including for marketing and sales activities) was between TGI and *General Rubber*.

Second, TGI has not shown that General *Science* put forth any products or materials, or serviced or manufactured any items, that "were used or consumed within this state"—TGI even acknowledges that General *Rubber* "is focused on the

production and manufacture of premium tires" [D.E. 1-2 at 144 ¶ 15] [D.E. 8-2 at 2–8].  So, on its face, TGI has not carried its burden under § 48.193(1)(a)(6).

But, in any event, the third reason § 48.193(1)(a)(6) cannot apply to this dispute is that TGI is seeking purely economic losses. That is a fatal problem under this subsection because "the provisions of section 48.193(1)[(a)(6)] contemplate personal injury or physical property damage." *Aetna Life & Cas. Co. v. Therm-O-Disc, Inc.*, 511 So. 2d 992, 994 (Fla. 1987).  Hence, "[i]t is well-established[] that mere economic injury without accompanying personal injury or property injury does not confer personal jurisdiction over nonresident defendants" under § 48.193(1)(a)(6). *Sculptchair*, 94 F.3d at 629 (citing *Sun Bank, N.A. v. E.F. Hutton & Co.*, 926 F.2d 1030, 1033 (11th Cir. 1991)).

TGI's amended complaint brings a total of thirteen claims—eleven of which are against either General Science alone or both Defendants.[3]  [D.E. 1-2 at 147–60]. Each (except for Count XII, injunctive relief) seeks recovery for economic losses—whether by way of alleged tort or contractual breach.  TGI alleges no physical injury suffered nor any physical property damage, as it must to invoke this subsection of the Florida long-arm statute.  *See GAF Corp. v. Sack Co.*, 445 So. 2d 350, 351 (Fla. 3d DCA), *review denied*, 453 So. 2d 45 (Fla 1984) ("No one was ever personally injured

---

[3] The two claims against General Rubber are for breach of contract and negligence—both arising from the alleged failure to have the containers of TBB branded tires shipped and delivered.  It is beyond the purview of this report and recommendations, but query how General Rubber could "recall Container #BSIU9156400 and Container #BEAU5278265" [D.E. 1-2 at 148 ¶ 49] when "General Science *unilaterally* recalled Container #BSIU9156440 and Container #BEAU5278265."  [D.E. 10-2 at 4 ¶ 22] (emphasis added).

due to the defective roofing materials; no one's property was ever damaged due to the defective roofing materials; and no claim was ever made below for personal injuries or property damage. This being so, the law of torts affords no cause of action for the plaintiff[] to recover for its purely economic losses in this case.") (citing W. Prosser, *Law of Torts* § 101 at 655 (4th ed. 1971)). Because TGI "has neither alleged nor proven personal injury or property damage aside from the purely economic loss pleaded in its [amended] complaint, we find no basis for asserting personal jurisdiction" over General Science under § 48.193(1)(a)(6). *Sculptchair*, 94 F.3d at 629.

As the First District Court of Appeal put it, in an opinion quoted by the Florida Supreme Court:

> If [allowing recovery for economic losses, in addition to bodily injury or physical property damage,] were the intent of the Florida legislature in enacting section 48.193(1)[(a)(6)], why then did the legislature also enact section 48.193(1)[(a)(2)] (authorizing jurisdiction over anyone who commits a tort within this state) and section 48.193(1)[(a)(7)] (authorizing jurisdiction over anyone who breaches a contract in this state by failing to perform such an act required by the contract to be formed in this state), given that the usual remedy in such cases is an award of damages for the financial loss suffered as a result of the tort or breach of contract?

*Aetna Life & Cas. Co.*, 511 So. 2d at 994 (citing *Aetna Life & Cas. Co. v. Therm-O-Disc, Inc.*, 488 So. 2d 83, 91 n.3 (Fla. 1st DCA 1986)) (emphasis omitted). In other words, § 48.193(1)(a)(6) is very specifically limited to "injury to persons or property within this state"—not in the abstract, but actual, tangible injury. Hence, even if General Science did have some modicum of engagement in the State of Florida (which has not been demonstrated), § 48.193(1)(a)(6) would nonetheless be inapposite.

24

Accordingly, we find that Florida's long-arm statute does not extend to General Science under Florida Statute § 48.193(1)(a)(6), which focuses on "injury to persons or property within this state" that have nothing to do with purely economic losses like those sought here.

### 3. *Section (1)(a)(7)—Beaching a Contract in Florida*

Section 48.193(1)(a)(7) of the Florida long-arm statute contemplates the following:

> Breaching a contract within this state by failing to perform acts as required by the contract to be performed in this state.

Fla. Stat. § 48.193(1)(a)(7).

TGI argues that General Science, at a minimum, breached its oral contract regarding the Lancaster tires. [D.E. 1-2 at 147] (Count I). But TGI suffers from the same recurring evidentiary problem. The record still only supports that there were several agreements between it and *General Rubber*—not General Science. [D.E. 8-2 at 3, 10, 23]. Again, there is nothing in the record—no invoice, email, memorialization of a key phone call, polo shirt, pen, wrapped car image, or otherwise—that indicates TGI was doing business with General Science—only General Rubber. This hearkens back to *Sculptchair*: "This argument overlooks the salient fact that none of the defendants were a party to that particular contract, making it difficult for them to breach its terms." 94 F.3d at 629.

Here, Defendant General Rubber clearly had some level of involvement in the sale of tires and certain marketing endeavors. But nothing in this record suggests that General Science did have such involvement.

25

Accordingly, we find that Florida's long-arm statute does not extend to General Science under Florida Statute § 48.193(1)(a)(7): "Breaching a contract within this state by failing to perform acts as required by the contract to be performed in this state." And, in sum, we find that neither section (1)(a)(1), (6), or (7) of Florida's long-arm statute extends to Defendant General Science.

Under the two-step test for personal jurisdiction, our analysis could end here, as personal jurisdiction does not exist "over the nonresident defendant[s] under Florida's long-arm statute." *Louis Vuitton Malletier, S.A.*, 736 F.3d at 1350. But in the interest of a thorough examination of the motion and because we believe TGI also fails to prove that General Science has sufficient contacts with the State of Florida for specific personal jurisdiction, we will further analyze prong two: "if [Florida's long-arm statute were to apply], whether that exercise of jurisdiction would violate the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution." *Id.* We are satisfied that TGI fails on that ground as well.

### B. *Minimum Contacts*

If we make believe that Florida's long-arm statute had been satisfied, exercising specific personal jurisdiction over General Science would violate the Due Process clause. "The Due Process Clause protects an individual's liberty interest in not being subject to binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471–72 (1985) (citing *Int'l Shoe Co. v. State of Wash., Off. Of Unemployment Comp. & Placement*, 326 U.S. 310, 319 (1945)).

"In specific personal jurisdiction cases, we apply the three-part due process test, which examines: (1) whether the plaintiff's claims 'arise out of or relate to' at least one of the defendant's contacts with the forum; (2) whether the nonresident defendant 'purposefully availed' himself of the privilege of conducting activities within the forum state, thus invoking the benefit of the forum state's laws; and (3) whether the exercise of personal jurisdiction comports with 'traditional notions of fair play and substantial justice.'" *Louis Vuitton Malletier, S.A.*, 736 F.3d at 1355 (citing *Burger King Corp.*, 471 U.S. at 472–73).   "The plaintiff bears the burden of establishing the first two prongs," at which point, provided the plaintiff has done so, the burden switches to the defendant to "'make a "compelling case" that the exercise of jurisdiction would violate traditional notions of fair play and substantial justice.'" *Id.* (citing *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1267 (11th Cir. 2010)).

As to prong one, "[P]laintiff[] must at minimum demonstrate that the [D]efendant[s] had 'some contact with the forum state and that the contact was a but-for cause of the alleged tort [or grievance].'" *PG Creative Inc. v. Affirm Agency, LLC*, No. 19-24299-CIV, 2019 WL 5684219, at *4 (S.D. Fla. Oct. 31, 2019) (citing *USA Mgmt. Group, LLC v. Fitness Publications, Inc.*, No. 14-22477-CIV, 2015 WL 11233075, at *3 (S.D. Fla. Mar. 4. 2015)).   "[T]he relationship must arise out of contacts that the 'defendant *himself*' creates with the forum." *Walden v. Fiore*, 571 U.S. 277, 277 (2014) (quoting *Burger King Corp.*, 471 U.S. at 475).

27

Again TGI has not established that Defendant General Science indeed had contacts with the State of Florida—let alone that such contacts were the "but-for cause of the alleged tort [or grievance]." *PG Creative Inc.*, 2019 WL 5684219, at *4 (internal citation omitted).  General Science was, at all times, a non-resident of the State of Florida (and United States) [D.E. 16-2 at 3 ¶¶ 6–7] and the evidence before us indicates that General Rubber, not General Science, was the party to the sales and marketing engagements with TGI.   [D.E. 8-2 at 3, 10, 23].   Plaintiff alleges interactions and contacts with General Science that are simply untethered to the record evidence available to the Court. Hence, General Science could not have had the necessary contacts with the State of Florida or its residents to find it "availed [itself] of the privilege of conducting activities" within the State of Florida.  *Louis Vuitton Malletier, S.A.*, 736 F.3d at 1355.

In sum, the record evidence does not show that General Science had any contacts with Florida—let alone contacts from which TGI's claims could arise. General Science has not manufactured, sold, or shipped anything to Florida. It has no agents, employees, or offices here. It has not solicited any Florida business. And every document associated with the tire transactions identifies General Rubber—not General Science—as the counterpart.  Hence the Due Process problem.

Accordingly, we find that TGI has not carried its burden as required as to the first two prongs of the minimum contacts test under the Due Process Clause of the Fourteenth Amendment.  *Id.*  And because TGI also could not show that either Section (1)(a)(1), (6), or (7) of Florida's long-arm statute would extend to Defendant

28

General Science, we **RECOMMEND** that General Science's motion to dismiss [D.E. 8] be granted on both the statutory and due process grounds necessary to sustain personal jurisdiction in this case.[4]

### C.   *Whether Arbitration Should be Compelled*

General Science also advances an alternative motion to compel, arguing that TGI's claims in its amended complaint are subject to arbitration and are improperly before this Court.  [D.E. 8 at 23].  Per General Science, the TBB branded tire shipping invoices reflecting a transaction between General Rubber and TGI include "a broad, unambiguous, and binding arbitration clause."  *Id.* at 24.  And, indeed, proforma invoices for two of the three shipments do contain the stipulation:

> All disputes arising from the execution of, or i[n] connection with this contract, shall be settled amicably through friendly negotiations.  In case no settlement can be reached through negotiation, the case shall be submitted to [the] China International and Economic Trade Arbitration Commission, Beijing for arbitration in accordance with its rules of arbitration.  The arbitral award i[s] final and finding upon both parties.

[D.E. 8-2 at 3, 10].

Several complications attend this argument. The documentation in the record does not reflect such a provision for the third shipment, "GRTG-P-202304."  And, to the extent Mr. Gonzalez's declaration reflects the traditional course of invoicing for General Rubber and TGI (a proforma invoice with an estimate and a final invoice with the "final price and terms of purchase") [D.E. 10-2 at 3 ¶ 20 n.1], the only invoices in the record that reflect this arbitration provision are proforma invoices.  [D.E. 8-2

---

[4]   Because we find that we do not have personal jurisdiction over Defendant General Science, we also note that its argument as to Rule 12(b)(5), regarding improper service of process, is moot.

at 3, 10]. In other words, based on the record before us, the application of the arbitration provision is perhaps not as clear-cut as General Science makes it out to be.

To reconcile the argument that General Science is not the correctly sued party with its seeking to invoke the alleged arbitration agreement in the invoices reflecting transactions between General Rubber and TGI, General Science cites case law from this Circuit where non-signatory parties are allowed to compel arbitration under the theory of equitable estoppel:

> A party who is a non-signatory to an arbitration agreement may nevertheless compel arbitration under the doctrine of equitable estoppel in two circumstances: (1) "when the plaintiff-signatory must rely on the terms of the written agreement in asserting its claims," or (2) "when the plaintiff-signatory alleges substantially interdependent and concerted misconduct by the signatories and non-signatories, and such alleged misconduct is founded or intimately connected with the obligations of the underlying agreement[.]"

*Northrop & Johnson Yachts-Ships, Inc. v. Royal Van Lent Shipyard, B.V.*, 855 F. App'x 468, 474 n.4 (11th Cir. 2021) (alteration in original) (citing *Lavigne v. Herbalife, Ltd.*, 967 F.3d 1110, 1118–1119 (11th Cir. 2020)). But having to apply equitable estoppel is yet another complication that makes this issue less than attractive at this stage.

In sum, complications abound. The third shipment's documents contain no arbitration provision. [D.E. 8-2 at 23]. The invoices containing the clause are proforma—estimates, not final contracts. And General Science is seeking to enforce a clause from contracts to which, by its own account, it was not a party; it relies on equitable estoppel to do so. [D.E. 8 at 23–24].

It follows that we should not resolve these questions.  We have already found that we do not have personal jurisdiction over General Science.  So, for our purposes we need not tackle the muddled arbitration issue. We **RECOMMEND** that General Science's motion to compel arbitration be denied as moot.

### III.   CONCLUSION

For the foregoing reasons, we hereby **RECOMMEND** that Defendant General Science's motion to dismiss and to compel arbitration [D.E. 8] be **GRANTED in part and DENIED in part**.  The motion to dismiss for lack of personal jurisdiction should be Granted and the amended complaint Dismissed.  If it was possible for TGI to properly allege and support under Rule 11 factual allegations to sustain personal jurisdiction over this Defendant, we should grant TGI one opportunity to do so. Accordingly the amended complaint should be Dismissed but with leave to amend. Any amended complaint should be filed within fourteen (14) days unless objections are filed to this Report and Recommendation that would automatically stay that requirement.

Pursuant to Local Magistrate Rule 4(b) and Fed. R. Civ. P. 73, the Court finds good cause to expedite objections to this Report, if any. The parties have seven (7) days from service of this Report and Recommendation within which to file written objections with the District Judge.  Failure to timely file objections shall bar the parties from *de novo* determination by the District Judge of any factual or legal issue covered in the Report *and* shall bar the parties from challenging on appeal the District Judge's Order based on any unobjected-to factual or legal conclusions

included in the Report.  28 U.S.C. §636(b)(1); 11th Cir. R. 3-1; *see, e.g.*, *Patton v. Rowell*, 678 F. App'x 898 (11th Cir. 2017); *Cooley v. Comm'r of Soc. Sec.*, 671 F. App'x 767 (11th Cir. 2016).

**DONE AND SUBMITTED** in Chambers at Miami, Florida, this 20th day of February, 2026.

/s/ *Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge